## Louisville Packing Company v. M. S. Crain

(Decided December 16, 1910.)

### Appeal from Breathitt Circuit Court.

1. Contracts—Breach—Action Thereon—Question to be Determined.—The single question to be determined in this case is was the contract sued on breached, and if so, by whom and when?

2. Order to Ship Goods Purchased—Time of Payment.—An order to ship out goods purchased, to be binding must have been accompanied by a promise to pay according to the terms of the contract of sale, and in the absence of any stipulation in the contract as to time or terms, cash payment upon delivery of the goods must be presumed.

3. Avoidance—Waiver—Breach—Renewal.—Where one party to a contract seeks to avoid a compliance with its terms we see no good reason why the other may not without waiving his rights, make an honest effort to have the party in fault comply with his contract, nor is any good reason assigned why this effort be construed to reinstate or renew a contract which had been breached. The contract being breached on February 26 appellant's right under its counter claim must be determined as of that date unless by its conduct it made the breach relate to a later date.

4. Breach—Action Thereon—Time of Action.—Parties to an executory contract have a right to have the contractual relation maintained up to the time for its performance, and if one of the parties renounces or breaches it before that time the other may sue on the breach at once.

5. Breach—Renunciation—Effect.—If one of the contracting parties elects not to accept the breach or renunciation, but continues to insist upon the performance of the contract according to its terms,

then the contract remains open or in existence for the benefit of both parties; and if during such time anything occurs to discharge or invalidate it the party seeking to renounce it may take advantage of such discharge.

6. Change in Condition of Market—Effect.—Having given to appellee the right to go ahead and carry out his contract, we see no good reason why appellee should be denied the benefit of any change in the condition of the market that may have occurred between the date of his renunciation and the date or its acceptance by appellant, May 2nd, and so long as the contract might have been performed, appellant is in no condition to complain that his rights are measured by the condition of the market on May 2nd, the date of the acceptance of the renunciation.

7. Failure to Show Breach.—Appellant has not shown by the proof that he was damaged by the breach of the contract and he is entitled to nothing on his counter-claim.

KOHN, BAIRD, SLOSS & KOHN and J. J. BACH for appellant.

A. H. PATTON, GOURLEY, REDWINE & GOURLEY for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

This is an appeal from the judgment of the Breathitt Circuit Court awarding to appellee, M. S. Crain, damages against the appellant, Louisville Packing Company, in the sum of $1,215.69, for breach of contract for the sale by appellant to appellee of 100,000 pounds of side meat of a certain quality, and 30,000 pounds of lard. The memorandum evidencing this contract was executed in duplicate on January 10, 1908. It recites that one party had bought and the other had sold, the memorandum kept by appellee being styled the buyer's contract and that by appellee the seller's contract. Said contracts are as follows:

"SELLERS CONTRACT.

"We, the undersigned, have this 10th day of January, 1908, sold to M. S. Crain, Jackson, Ky., 100,000 D. S. extra short clear sides, packed in 200 or 300 pound boxes, at 7⅞c per lb., delivered in Jackson, Ky., during the month of February, 1908. Carrying charges to be ⅛c per lb. per month or fraction of a month after February. Finally (final) delivery to be made January 1, 1909.          "THE LOUISVILLE PACKING CO.

"Buyer's contract exchanged.
          "By F. G. BETZ.

"C. D. CALLAHAN."

## "SELLER'S CONTRACT.

"We, the undersigned, have this 10th day of January, 1908, sold to M. S. Crain, Jackson, Ky., 30,000 lbs. Compound lard, at 7⅜c per lb. tierce basis, delivered in Jackson, Ky., during the month of February, 1908. Any Compound not delivered during February as aforesaid shall be subject to ⅛c per lb. per month or fraction of a month carrying charges. Finally (final) delivery to be made January 1, 1909.

　　　　　　　　　"THE LOUISVILLE PACKING CO.

"Buyer's contract exchanged.

　　　　　　　　　"By F. G. BETZ.

"C. D. CALLAHAN."

It appears that, at the time these contracts were made, the market price of meat and lard of the quality called for in the contract was 7⅜c per lb. for meat and 7⅛c per lb. for lard. In other words, the contracts of purchase and sale were at practically the market price at that time. The shipping charges from Louisville to Jackson were ⅜c per lb., and this was added. In the latter part of January and early in February the prices of both meat and lard of the character described in the contracts went down until they could be bought in the Louisville market for 7c per lb. On February 26th, while the market was in this condition, appellee wrote to appellant the following letter:

　　　　　　　"Jackson, Ky., Feb. 26, 1908.

"Louisville Packing Co., Louisville, Ky.:

"Dear Sirs:—I have your statements in regard to invoices Dec. 21, 1907, and Jan. 21, 1908. Am sorry that I cannot pay you at this time, but times are very hard and I cannot pay you any before March 15, 1908, and then possibly the invoice of Dec. 21, 1907. I cannot afford to pay you carrying charges on the other meat and lard you have me booked for, and I will kindly ask you to ship meat and lard as bought for Feb. shipment as I cannot pay carrying charges and if you ship advise me at once so I can arrange storage. Times are dull and I do not know when I can pay this, but I will pay as soon as I can. Of course if you do not care to ship you can cancel the entire order as times are very dull and I fear my inability to pay. Do not ship any of those goods unless

you ship all due me and advise what action you intend
to take in the matter at once.

"Yours truly,
"M. S. CRAIN.
"Executed in duplicate.
"Witness:—A. B. EDWARDS."

This letter was received in due course of mail, and
on the 29th, or three days thereafter, appellant wrote
to appellee the following letter:

"Feb. 29, 1908.
"M. S. Crain, Jackson, Ky.

"Dear Sir:—We have your letter of 26th inst. which
appears to be a very curious document to come from a
reputable business man like yourself. You have a contract
with us which all the 'executing and witnesses in duplicate'
won't change. For what meat we already shipped on
this contract you have not yet paid us, which you know
is not right, but we are always willing to be lenient and
help our good friends wherever and whenever we can.

"In reference to shipping you out balance of meat and
lard on these contracts, we want to remind you that the
spirit and intent of this contract is that we are to ship
out this meat and lard to you, as you may need it from
month to month for your legitimate trade cov-
ering the entire year, and this carries with
it that you are to pay the carrying from
month to month; however, we will ship out the entire
contract with bill of lading attached to draft, which
means that you must pay the draft on presentation. It
is the universal custom of the provision trade when meat
and lard is shipped in car lots to draw a draft for amount
of invoice.

"You say in your letter you don't know when you
can pay us for the meat and lard, and still demand that
we ship it. You must know that you are asking some-
thing of us that is unjust and which no court in the land
will uphold. We don't think, however, that you are mak-
ing this demand and statement with a view of repudiat-
ing the contract in case we would refuse to ship, as we
feel that you could not afford to do it.

"We sold you these contracts in good faith and in-
tend to carry out both the letter and spirit of same,
and we shall expect the very same from you. Let us have
your pleasure in the matter.

"Yours truly,"

Appellee did not answer this communication, and shortly thereafter, sometime in the month of March, Mr. Callahan, a salesman representing appellant and who had made the contract with appellee for it, went to Jackson to appellee's place of business to see him relative to this contract, or to try and induce him to carry it out. Relative to this visit, appellee, in his deposition, states: "* * * After giving him a check, I told him in the presence of Mr. Griffith that I wanted him to have the company ship me the remainder of the meat due me on said contract and also ship me the lard that was due on arrival of the meat that I had as much as $4,000 in cash that I would pay down on the meat and that I would be able to pay the remainder of what the meat and lard come to inside of thirty days."

Mr. Callahan's version of what passed between him and appellee at that time is not at all in accord with what appellee testifies to, and the witness, John C. Griffith, who was prsent and heard the conversation, throws little light upon the point in dispute. Following this visit of Callahan's to appellee, appellant wrote this letter on March 20th:

"Louisville, Ky., Mar. 20th, 1908.
"M. S. Crane, Jackson, Ky.

"Dear Sir:—Mr Callahan has communicated to us the substance of his interview with you as regards shipping meat and Compound to you on contract existing between us. We cannot see from any viewpoint that it would be to your interest to order out a large quantity of meat and lard at this time, and we have your interest at heart in this business as well as our own. It is always better to live up to the letter and spirit of a contract, and we will try to explain it to you as best we know how.

"In the first place you would be doing yourself a great damage by taking out all this meat and lard now, because you would have it on hand a long, long time, and it would sink in weight and deteriorate in condition, possibly a large quantity of it would spoil, and compound is liable to become rancid, all of which would cause you loss and trouble with your customers. Also at the present time the market is somewhat against you and it would be impossible to sell this meat rapidly except at a big loss. If the market were in your favor there would be some good excuse for you taking the meat now, as you could sell it out by cutting the price slightly under the market but this is impossible now. We don't think you will

lose anything on this contract if you will take the meat and lard out as you need it and pay the carrying charges from month to month, as the market is sure to advance right along and you will be gaining more than the small monthly carry charges amounts to; besides, you will be getting fresh packed meat and lard right along that will always give your trade good satisfaction.　We think if you will look at this matter in the proper light you will see that we are advising you for your own good and will take out the meat as you need it for your business.

"In regard to terms, whenever meat and lard is ordered out in car lots the terms are always draft with bill of lading attached.　We cannot buy it any other way, nor do we ever ask it any other way—it is a trade custom which cannot be altered.　The terms on meat, etc., shipped in a small way are ten days, but we have been allowing you thirty days; however, you have been making us wait even longer for our money, still we are not complaining about this, as it is never our desire to unduly push our friends.

"If you need any meat and lard we will ship it as per contract, and charge the carrying charges as per contract which is as much a part of the contract as anything else in it.

"Yours truly,

"THE LOUISVILLE PACKING CO,

"Per F. G. BETZ."

At this time the price of both meat and lard of the quality called for in the contract was below the contract price.　No response was made by appellee to this letter. On April 27th, the following letter was written to appellee:

"Louisville, Ky., Apr. 27, 1908.

"Mr. M. S. Crain, Jackson, Ky.

"Dear Sir:—It seems rather strange to us that you have not ordered out any meat on your contract for some time.　You will remember a little while back you wanted all of it shipped when it looked to us that you would make a great mistake.　As you are not ordering out any meat means that you have no demand for it, so you see it would have been difficult for you to have disposed of the meat had we shipped it.

"Please let us hear from you by return mail.

"Yours truly,"

No attention being paid to this letter, appellant wrote to appellee on May 2, 1908, as follows:

"Louisville, Ky., May 2, 1908.

"Mr. M. S. Crain, Jackson, Ky.

"Dear Sir:—We are in receipt of a letter from Mr. Calahan giving us in substance his interview with you in regard to the contract existing between us on meat and lard. Unless we hear from you in the next few days that you intend to comply with this contract we shall make out our claim and place it in the hands of a lawyer. We trust you will not trifle with us in this matter of contract entered into with you in good faith. It does not become a business man of your standing to be guilty of repudiating such a contract, and we are really surprised at the development. Please let us hear from you as we don't care to take legal steps unless absolutely compelled to. "Yours truly,"

The record does not show what the price of meat and lard was on May 2nd, but on April 29th, it is shown that meat of the quality called for was selling at 7⅜c per pound and lard at 7⅜c per pound. Appellee did not answer this letter of May 2nd, nor did he communicate in any way with appellant until August 5th, when he wrote to appellant the following letter:

"Jackson, Ky., Aug. 5, 1908.

"Louisville Packing Co., Louisville, Ky.

"Gentlemen:—On January 10, 1908, I bought from your Mr. C. D. Callahan 100,000 lbs. Dry Salt Extra clear side to be packed in two or three hundred pound boxes to be delivered in Jackson, Ky., during the month of February, 1908, carrying charges to be ⅛c per lb. per month after Feb., 1908. I also bought 30,000 lbs. Compound Lard at 7⅜c per pound tierce salt basis delivered in Jackson, during the month of Feb., 1908, same carrying charges to apply. I ordered all of this shipment out on Feb. 26, 1908, and you refused to ship. I have your letters of Feb. 29, Mch. 20, Apr. 27 and May 1, 1908, in which you are urging me to place orders with you for shipments on this meat and lard. I beg to advise that I now have my stock sold out and am in a position to handle this entire contract and want you to ship me at once 50-200 boxes dry salt meat and two ton Compound lard in 50-lb. tins as bought with carrying charges added to the present time. Kindly advise what action you take and oblige. "Yours truly,"

No response was made by appellant to this letter, and on August 13th it received from Noble & Noble, merchants, at Lost Creek, Ky., the following letter:

"Lost Creek, Ky., Aug. 13, 1908.

"The Louisville Packing Co., Louisville, Ky.

"Gentlemen:—We have been negotiating with M. S. Crain about the contract he has with you for 100,000 pounds of D. S. Extras and some compound lard in view of having him make this contract over to us or order the meat and lard out for us. He estimates that he would want about ($600.00) six hundred dollars to do this and we have about decided to close a deal with him on that basis and would like to know if we might expect prompt shipment of these goods if we make the deal.

"In the absence of your early reply, if in the meantime we close the deal with Mr. Crain and get a Power of Attorney from him to order out these goods which we of course would should we deal, we will expect you to make prompt shipment of receipt of order. Further, if we make the deal what will you pay us cash to cancel remainder of order after shipping us 25,000 pounds of meat and 5,000 pounds of the lard?

"Awaiting your early reply, we are,

"Very truly yours,

"NOBLE & NOBLE.

"H."

No attention was paid to this letter.

It appears from the record that, from the date of the making of this contract up until the first of April, the market price of both meat and lard declined; that during the months of February and March the price of both these commodities in the open market was below the contract price; that during the month of April the market gradually improved, and about May 1st it had again reached a price approximately the same as the contract price. From May 1st until October 1st it gradually increased for both meat and lard, at which latter time it had reached a value of about 10¾c per pound for meat and 8⅜c per pound for lard. After this date the price gradually declined.

On October 7th, 1908, appellee filed this suit, in which he claimed a breach of the contract on the part of appellant, by reason of its failure and refusal to honor the request made on it for the entire purchase of both meat and lard, as set out in his letter of February 26, 1908. The answer denied a breach of the contract on the part

of appellant and alleged that, by the letter of February 26th, 1908, appellee had breached both contracts in their entirety. The reply traversed the affirmative matter in the answer. By agreement, the case was transferred to the equity docket, and prepared, heard and tried in equity.

Except for the difference between the testimony of appellee and Mr. Callahan as to what took place at his store early in March, 1908, there is no dispute in the record concerning any fact. The contract is in writing, and everything that was said or done by either party looking toward its breach or performance is fully set out in the correspondence between them. Appellee introduced proof to show that when he directed this meat and lard shipped to him he was financially able to pay for it.

After the submission of the case the special judge who tried it delivered an opinion, in which he found that appellant had breached its contract, and that because thereof appellee had been damaged in the sum of $1,215.69; and judgment was accordingly entered in his favor for that amount, with interest from May 28, 1910. Of this finding and judgment, appellant complains.

The single question for determination is, was the contract breached, and, if so, by whom and when. By his letter of February 26th, it is quite evident that appellee sought to be relieved from the terms of his contract, and is equally clear that appellant, by his letter of February 29th, and through its agent Callahan, and the other letters written by it to appellee up to that of May 2nd, was doing what it could in a peaceful and pleasant way to induce appellee to stand by his contract. Appellee wanted to be relieved from the contract because the price of both meat and lard had declined, and he would have been enabled to purchase his supplies in the open market at a price materially less than that for which he had contracted. For this very reason appellant sought to hold him to his contract and did everything that it could to induce him to comply with its terms.

But, it is argued for appellee, his letter should not be construed as an effort on his part to avoid the contract, for he clearly stated in it to appellant that he wanted all of the goods shipped him at once. It is true that he did, but coupled with this statement is the further statement that he could not pay for same at that time, and he did not know when he would be able to do so, though, when he was able, he would. An order to ship out the goods

to be binding must have been accompanied by a promise to pay according to the terms of the contract of sale, and in the absence of any stipulation in the contract as to time or terms, cash payment upon delivery of the goods must be presumed. But it is argued that the customs of the trade were that appellee should have ten days' time within which to pay for the goods after their delivery, and that a payment within this time is regarded and treated as a cash payment, and that, according to appellant's letters, this time for payment might have been extended to thirty days. Giving to appellee the full benefit of such contention, and conceding, for the purpose of measuring his rights under his letter of February 26th, that, under the customs of the trade, a purchaser had as much as thirty days time within which to pay for goods bought under contracts similar to that under consideration, still appellee does not bring himself within the protection of such a rule, for he does not promise to pay within thirty days, or at all unless he is able. The proposition which he submitted to appellant, to-wit, to ship all the goods upon such terms, was one with which no good business man would be expected to comply and which no court would enforce. This being so, his letter amounted to no more than a statement to appellant that, although he had bought the goods and wanted them shipped, he was unable to pay for them at that time and did not know when he could, and was unwilling to pay the carrying charges of ⅛c per pound after February; or, otherwise expressed, "I cannot take the goods and pay for them according to the contract, and I am unwilling to pay you for carrying them for me according to the terms of the contract."

Appellant, through its agent and by its correspondence, clearly shows that it was unwilling to release appellee from compliance with its contract, and all that it did between the receipt of this letter and its letter of May 2nd was in pursuance of this effort on its part. On May 2nd it notified appellee that it would no longer endeavor to induce him to comply with his contract, and would stand upon its legal rights and proceed against him for a breach thereof, unless in a few days he arranged to comply with its terms. If appellee, at the time of the receipt of this letter written him on May 2nd, did not look upon the contract as terminated and ended, it was his duty to have so notified appellant. This he did

not do, but remained silent until early in August, at which time the price of both meat and lard had advanced to such an extent that there would be a handsome profit in his contracts, and then, and not until then, does he speak. His letter of February 26th was clearly a breach of the contract, and unless the conduct and correspondence of appellant, following the receipt of this letter, can be construed to operate as a waiver of its rights or as avoiding the breach and leaving it within the power of appellee, notwithstanding the breach, to enforce the contract, appellee's demand in his letter of August 5th amounts to a nullity.

When one party to a contract seeks to avoid a compliance with its terms, we see no good reason why the other may not, without waiving his rights, make an honest effort to have the party in fault comply with his contract. Nor is any good reason assigned why this effort should be construed to reinstate or renew a contract which had been breached. When appellee demanded the performance of his contract upon terms other than those agreed upon, or its cancellation, leaving to appellant no choice in the matter but a compliance with one or the other of the propositions set out in the letter, he put in the way of the performance of their contract an obstacle which he alone could remove. All that appellant did or said in its letters was to request appellee to remove the obstacle which he had placed in the way of the execution of this contract. This appellee, by his silence, steadfastly refused to do; and even in his letter of August 5th there is not an intimation that he proposed complying with his contract in so far as it required that he should pay carrying charges upon the remainder of his purchase from February until August, or that he proposed to receive or pay for the remainder of the meat and lard called for in the contract according to its terms. His whole conduct, as evidenced by his letter of February 26th and his disregard of the several letters written to him by appellant thereafter, shows that he regarded the contract as cancelled; and had it not been that the price of meat and lard so advanced as to show a profit in the contract, his attitude now would be in accord with his position then taken.

The contract being breached on February 26th, appellant's right under its counterclaim must be determined as of that date, unless, by its conduct, it made the breach

relate to a later date, to-wit, May the 2nd, when its last letter was written to appellee.

In 9 Cyc, 635, it is announced, as a general proposition, that the parties to an executory contract have a right to have the contractual relation maintained up to the time for its performance, and if one of the parties thereto renounces or breaches it before that time, the other may sue on the breach at once. This proposition is supported by the weight of authority. But there are limitations to the rule, one of which is, that if one of the contracting parties elects not to accept the breach or renunciation, but continues to insist upon the performance of the contract according to its terms, then the contract remains open or in existence for the benefit of both parties; and if, during such time, anything occurs to discharge or invalidiate it, the party seeking to renounce it may take advantage of such discharge. 9 Cyc, 637; Smith v. Georgia Loan, etc., Co., 113 Ga. 975; Kadish v. Young, 108 Ill. 170; Howard v. Daly, 61 N. Y. 362; Avery v. Bowden, 5 E. & B. 714.

In this last case, which is cited as a leading authority upon this question, the defendant had agreed to supply a cargo for plaintiff's ship within a certain number of days after it reached Odessa, the port from which it was to sail. Upon reaching the port, the plaintiff demanded a cargo, but defendant's agent in charge refused to supply one. Instead of accepting this refusal as a breach of the contract, plaintiff continued to demand that the cargo be supplied, and so continued from day to day and until war broke out between England and Russia, which made the performance of the contract impossible. The time within which the ship might have been loaded had not expired when the war broke out. Thereafter plaintiff sued for breach of contract and the court held that. as plaintiff had not accepted the renunciation, but continued to demand its performance from day to day, there had been no actual breach, and for this reason denied to plaintiff the right to recover. Clearly, a recovery would have been allowed but for the continued demand on the part of plaintiff that the contract be performed.

That case is very similar to the one under consideration, and furnishes authority for holding that the contract in this case remained open until May the 2nd, when appellant notified appellee that it would no longer insist upon a performance but would stand upon its legal rights.

During this time appellee might have withdrawn his renunciation, and gone on and accepted the meat and lard according to his contract, and appellant would have been in no position to have denied to him this right after having invited him to do so. But it was not obliged to continue to importune appellee to do that which in law he should have done, and when, on May 2nd, it wrote to appellee the letter above set out, the parties to the contract were placed in the same relation in regard thereto that they would have been had the letter of May 2nd been written on February 29th, immediately upon receipt of appellee's letter of February 26th.

Having given to appellee the right to go ahead and carry out his contract, we see no good reason why appellee should be denied the benefit of any change in the condition of the market that may have occurred between the date of his renunciation and the date of its acceptance by appellant, to-wit, May 2nd, and so long as the contract might have been performed, appellant is in no condition to complain that his rights are measured by the condition of the market on May 2nd, the date of the acceptance of the renunciation. The proof does not show what meat and lard were worth in the Louisville market on that day, but on April 29th, or only three days before, each was selling at practically the contract price, less the freight and carrying charges.

Appellant has not shown by the proof that he was damaged by the breach of this contract, and he is entitled to nothing on his counterclaim. Judgment is reversed and cause remanded with instructions to dismiss the petition.

Whole court sitting.