[L. A. No. 15422. In Bank.—December 31, 1935.]

E. A. BOYLES, Respondent, v. KINGSBAKER BROS. COMPANY (a Corporation), Appellant.

Lawler & Degnan for Appellant.

Hinsdale, Otis & Johnson, Moote & Longcroft and Robert W. Jennings for Respondent.

SEAWELL, J.—The plaintiff obtained judgment for breach of contract for the sale and purchase of a crop of Bartlett pears.

The questions presented upon appeal are mainly questions of fact. This court may not overthrow the judgment of the trial court in its decision on questions of fact unless there is a want of evidence to support the judgment.

The major question involved is whether the pears which were sold under a certain contract met the requirements thereof as to size, quality, shape and condition, interpreted, of course, with a consideration of the general rules and customs which are commonly recognized by the industry or trade in the standardization of such fruits.

Said contract was apparently written upon the stationery of the California Fruit Exchange and is dated Los Angeles, July 17, 1930. Omitting descriptive matter not material to the subject-matter of the contract, it is in form and words as follows:

"Confirmation of Sale.

"Kingsbaker Bros. Co.,
    Los Angeles,
        California.

"Gentlemen:

"The California Fruit Exchange confirms sale to you of Mr. Boyles' Bartlett pears from the Ione ranch, to be put up in unlabeled new wood, stencilled California Fruit Exchange, packed two layers, stems up, sizes 2¼" and larger, number one grade pears. The contract covers the entire crop of Mr.

Boyles' Ione pears, estimated at 150 tons. Shipment when pears are ready. Price $70 per ton F. O. B. shipping point on shipping point weights. Wood free. Shipments under standard refrigeration.

"Very truly yours,
"F. B. HENNEY
"FRANK B. HENNEY.

"Kingsbaker Bros. Co.
by Harry B. Kingsbaker.
FBH-mm.''

The California Fruit Exchange is a corporation with its home office at Sacramento and a branch at Los Angeles. Other organizations, such as the Sacramento River Association, are units of the parent body.

The plaintiff, E. A. Boyles, is admittedly well known as a grower of superior Bartlett pears and has been active in the organization of cooperative associations of that industry for a number of years in Northern California fruit areas. His ten-acre orchard from which the pears in suit were produced is located near the town of Ione, Amador County. The excellent quality of his pears was known to Mr. H. Kingsbaker, whose name appears on the contract, at and before the time he signed it on behalf of Kingsbaker Bros. Co., a corporation of which he was an officer. Said corporation was engaged in the wholesale business of buying and selling fruits and vegetables, with its office at Los Angeles. Mr. Frank B. Henney, acting for the California Fruit Exchange in confirmation of the sale, is by occupation a fruit broker or sales agent. He had been in the employ of the California Fruit Exchange for a number of years as a buyer of fruit. He received no salary. His compensation was based solely upon his "sales per car". Whether his transactions were subject to confirmation of the California Fruit Exchange (which will hereafter be referred to as the Exchange), or whether his authority was absolute in the buying of fruit, is not made clear. It appears from the record that Kingsbaker Bros. Co. was one of his best customers and that he had sold hundreds of carloads of fruit to that corporation.

The contract before us was made on July 17, 1930, at a time when the market was near its peak. Early in July a carload of Gridley pears had sold for $115 per ton delivered in Los Angeles. The early fruit always brings the highest

prices. About July 26th the market gave signs of weakening and there was a sharp decline in prices below the contract price during the balance of the season, as testified to by a number of fruit brokers who seemed to have been well informed as to the actual pear market, not only in the city of Los Angeles, but throughout California and the nation. These witnesses seemed wholly disinterested as to the result of the suit. The evidence in this case seems to decidedly preponderate in favor of the claim of plaintiff that a price of $70 per ton—plus $15 per ton for transportation from Ione, making the cost to defendant delivered at Los Angeles $85 per ton—was not obtainable for pears of the highest grade in the Los Angeles market, or any market, subsequent to the twenty-sixth day of July, 1930. Plaintiff Boyles was manager of the Sacramento River Association in 1930, and he testified, without any attempt being made to impeach his testimony in this particular, that the 1930 crop was the largest Bartlett pear crop the state had ever produced and that 31,000 tons of Bartlett pears went unharvested that year. He further testified that on August 1st, by reason of the over-production, the market took a "flop" and "there was little in pears that year"; that the market broke badly all over the United States; that about the middle of July pears were selling for $3.50 to $4.00 per standard box, but on July 26th the market dropped to one-half of the above amount, making a fifty per cent decline.

On the issue as to a very sharp decline in prices as compared with the contract price, the plaintiff's testimony is corroborated by H. S. Myers, manager of the Consolidated Produce Company of Los Angeles, with 28 years' experience in the produce business at Los Angeles. His testimony as to the market was based upon sales actually made by his concern. He submitted the following figures on sales which were within his personal knowledge: On August 2d, a carload of Martinez Valley pears sold at $70 per ton f. o. b. Los Angeles, or $55 per ton f. o. b. shipping point; August 4th, another carload at $65 f. o. b. Los Angeles or $50 at shipping point; August 8th, another carload at same price; August 4th, Gridley pears sold $40 per ton f. o. b. Gridley or $55 at Los Angeles; August 7th and 8th, Gridley pears sold for $60 a ton f. o. b. Los Angeles—$45 at Gridley; August 4th, sold carload for $50 f. o. b. Los Angeles; August

5th, sold carload at $50 per ton f. o. b. Los Angeles; August 11th, $60 f. o. b. Los Angeles; August 12th, $62 at Los Angeles. Said witness testified that the above quoted figures were the going prices for U. S. No. 1 grade pears, which is the best grade of pears placed on the market and outranks the Blue Anchor brand. It is the claim of defendant that the Blue Anchor No. 1 grade is a higher grade than the U. S. No. 1 and that the allowance for defective fruit is but five per cent while the U. S. No. 1 grade is ten per cent for defective fruit. These claims are refuted by testimony given by witnesses for the plaintiff. It was stipulated that Mr. Evan would give the same answers to the questions as were given by Mr. Myers. N. J. Parr, an employee of Byron, Green Packing Company at San Jose, California, who has been in the pear industry for 15 years, corroborated Mr. Boyles as to the pear production of 1930 and the consequent decline of pears in the market. He testified that the crop was the largest the state had ever produced and the finest grade of pears sold on August 9th brought $35 per ton shipping point. His firm bought 700 tons at that figure. Later in August, Lake County Bartletts, which are a very high grade, sold at $30 per ton, due to over-production. There can be no question that there is very persuasive evidence in the case coming from men actually engaged in the buying and selling of Bartlett pears in the markets of the state and elsewhere that the market suffered a decided decline by reason of over-production shortly after the contract herein was executed. Defendant offered certain daily market reports by which it was sought to show that the market, following the day the contract was executed, equalled if it did not exceed the contract price. These reports are made up from information obtained from dealers, railroads and truck companies, and there is little room for doubt that they are but estimates, more or less conjectural, and are easily subject to market manipulation. In the instant case buyers and sellers of pears who were actually engaged in daily transactions testified that a material drop in prices followed the execution of the contract and the jury and trial court having inferentially passed upon this issue, we are concluded by their finding. There is ample substantial evidence in the record sustaining the finding.

It is vigorously contended that the pears were not of the grade described in the contract and that the minds of the parties did not meet by reason of a failure to more specifically describe the grade of pears bargained for. Defendant contends that it had in mind the pears known as Blue Anchor No. 1 grade. There is such a grade of pears, which was established by the California Fruit Exchange, and it is defendant's claim that said grade is superior to all other grades and that was the grade of fruit it had in mind and believed it was buying. In addition, defendant asserts that the fruit shipped to it would not pass as "number one grade pears", tested by any known method of fruit standardization. Defendant also claims that a rescission of the contract was made by it shortly after the receipt of the sixth car by a letter which it addressed to the Exchange dated August 8th, the material portion of which reads: "Inasmuch as a number of cars have been shipped and rejected owing to the fruit not being of a number one grade, we now consider this contract at an end." The claim of defendant that the fruit was to be of the grade known as California Fruit Exchange Blue Anchor No. 1 grade nowhere appears in the contract, but it is nevertheless contended that Blue Anchor No. 1 grade was a product of California Fruit Exchange and is known in the Los Angeles market as a superior grade. Evidence was taken on this issue and the preponderance of the evidence is against the defendant's claim as to its superiority. In fact, there is evidence flatly contradicting the claim. Mr. Boyles, who is an officer of a pear association which is a unit of the parent body, the Exchange, testified that the U. S. No. 1 was the highest grade of pears to be found in the market. All of his shipments were of that grade. He further testified that he and F. W. Read, who at the time of trial directed the standardization work for the Exchange, established the Blue Anchor No. 1 grade. He testified that the "specifications for Blue Anchor grade, in the case of pears, is identical with the U. S. No. 1 grade of pears. U. S. Grade No. 1 meets Blue Anchor brand in all particulars, and Blue Anchor is our highest grade." Mr. Read testified to his long acquaintance with Mr. Boyles and stated that the Exchange had marketed his pears "throughout the United States and foreign countries for many years". He also testified that the Exchange "handles all goods for the account of the grower.

We buy nothing. We handle them on a straight commission business." W. F. Allewelt, supervisor for the U. S. Department of Agriculture and the California State Department of Agriculture fruit and vegetable inspection service, testified: "U. S. Grade No. 1 is the highest specific standard of pears entering into commercial channels in the state." It is the "basis used in the Federal certification and inspection in this state, on pears as on other products". He further testified that the gradings of Blue Anchor and U. S. No. 1 are identical, including the *tolerance* differential.

It is the testimony of Mr. Read, in charge of the field and standardization work of the Exchange which established the Blue Anchor No. 1 grade and which formulates the rules which govern that pack, that the U. S. No. 1 grade and the Blue Anchor No. 1 grade of 1930 were identical. There is other evidence in the case which tends to support the contention of plaintiff that the two grades of pears are practically identical. The U. S. No. 1 grade is unquestionably much more generally known to the trade. In fact, there is testimony to the effect that the Blue Anchor is a grade or brand originating within the Exchange organization and is not generally or widely recognized in the trade.

Appellant's effort at the trial was to so interpret the contract as to subject the quality of the fruit to the test of Blue Anchor No. 1 grade for the reason—as it contends—that the differential of five per cent only was allowed by this grade for defective pears, whereas the U. S. No. 1 grade test allows a ten per cent differential for defective fruit. The custom of the trade is that some allowance must be made for defective fruit for the reason, as pointed out by packers and growers, that it is not possible to grow, pick and ship a carload of fruit that will average higher than 80 per cent perfect as measured by the rigid inspection to which the higher grades are subjected. However, we have quoted the testimony of witnesses, and there are others whom we have not specifically named, which would certainly sustain a finding that the U. S. No. 1 grade is the common grade which obtains in the markets of this state, and that it ranks as high as the Blue Anchor grade in every material respect. There is a conflict as to whether the Blue Anchor allowed as great a differential for defective fruit as the U. S. No. 1. Two or three witnesses testified that in the final analysis they were the same in that

respect. But there is nothing in the term used in the contract, to wit, "number one grade pears", that would permit the appellant to apply a test which is only locally known as against one that is adopted by the federal and state departments of agriculture and recognized by the industry. No convincing parol evidence was offered to sustain such a claim. In fact, there is no ground supporting the contention that the pears were to be of any other quality than "number one grade pears", as stipulated in the contract. The quality and condition essential to constitute a number one grade of pears is clearly a matter of evidence. Of the two standards contended for by the respective parties as to the proper criterion by which the pears should be measured, the one established by the federal government and adopted by the state authorities should certainly prevail over one of a less general application in the determination of the question whether the pears were "number one grade pears" within the specifications of the contract. The real crux of the case and the point to which the volume of evidence was directed was whether the pears were of the size, shape and condition to entitle them to be classified as number one grade.

The transaction includes the shipment of eleven carloads of fruit from Mr. Boyles' orchard. The number of tons rejected and for which damages are asked is approximately 95. The first carload was shipped from Ione July 20th. It was inspected at Los Angeles upon arrival by Mr. Kingsbaker and Mr. Henney. Many objections were made to the shipment by Mr. Kingsbaker as to color, form and immaturity of the pears. He asserted that it was not the grade of fruit he contracted to buy. However, he and Mr. Henney arrived at an agreement and Mr. Kingsbaker accepted the shipment at the agreed price of $65 per ton. Mr. Kingsbaker also made objection to the second carload of fruit on various grounds, but said it was a better grade than the first and paid the contract price. The third car arrived a few days later and after inspection by Mr. Henney and Mr. Kingsbaker it was rejected. The fourth car arrived in due course and after inspection by Mr. Kingsbaker it was also rejected as not being up to grade. His testimony was to the effect that Mr. Henney said he could not expect him to accept the shipment as it was not the fruit he had contracted to buy. He said to Mr. Henney that four cars had been shipped and he con-

sidered none a delivery; that he would consult an attorney and inform himself as to whether the Exchange had not broken its contract; that if he relied upon the Exchange he would be without fruit; that if any more shipments arrived of the quality of the others he would not accept them. Mr. Boyles was informed of the complaints made by Mr. Kingsbaker and he arrived in Los Angeles on August 6th. He inspected the third car with Mr. Kingsbaker and Henney and insisted that that car and all other fruit was well within the requirements of the contract. Two days after the inspection made by all the parties in interest Mr. Kingsbaker wrote the letter to the Exchange, above set out at length, in which he notified the Exchange that "we now consider this contract at an end". The letter was forwarded to Mr. Boyles at Sacramento by the Exchange, and on August 18th he addressed a letter to Kingsbaker, the material portion of which is as follows:

"In your letter dated August 8, 1930, you state that

" 'Inasmuch as a number of cars have been shipped and rejected owing to the fruit not being of a number one grade we now consider this contract at an end.'

"Please be advised that all pears heretofore shipped to you have been of number one grade. This is to also notify you that I shall at the earliest practicable moment, sell·on the open market for the highest price obtainable all of the pears covered by the contract and then unpaid for and shall credit you with the net proceeds. That if the net proceeds amount to more than the sum due under said contract I shall remit the excess to you. But if said net proceeds amount to less than the sum due under the contract I shall hold you for the difference and in the event that said deficiency not being promptly paid by you I shall, much to my regret, be compelled to enforce payment by due process of law."

Other shipments arrived, were inspected and rejected by defendant or his employee.

After Mr. Boyles' arrival and conference with Mr. Kingsbaker, he still entertained the opinion that the fruit was well within the provisions of the contract, but because he felt that he was at a disadvantage in assembling the evidence and presenting the facts as fully as he thought the case warranted, he acceded to the settlement made as to the first shipment. He was influenced to do so because he was not certain that

he had at hand sufficient evidence to successfully controvert the representations made by Kingsbaker. Acting upon the conviction that the fruit was in every respect up to grade, he employed two United States and state inspectors to inspect each carload of fruit thereafter shipped. Two federal and state inspectors who made official examinations of the fruit, and the superintendent who had charge of the shipments examined the pears personally, and all were unanimously of the opinion that the pears were well within the classification of the number one grade. The only witnesses who entertained a contrary opinion were defendant Kingsbaker, broker Henney, who had large business transactions with the defendant, and a United States inspector. The latter was not altogether an adverse witness to plaintiff. He gave the fruit an 85 per cent grade and reported that three per cent of defects were bruises made in transit; two per cent mechanical injury. He concluded his report by the finding that if there were no mechanical bruises the pears may well have scored 92 per cent at shipping point. The grades of the two carloads of pears shipped to New York City, for the reason that the market had dropped to a low ebb in Los Angeles, is equally favorable to plaintiff upon every controverted issue of prices or grades of fruit.

We have not referred to all the evidence in the case which tends to show the existence of a conflict in the evidence, which is all that is necessary to compel an affirmance of the judgment, but we might go further and show that the judgment is supported by much substantial evidence which seems to preponderate in favor of the judgment.

We find no substantial merit in the claim that the action was not maintainable by Boyles because the contract was made in the name of the California Fruit Exchange. There can be no doubt that defendant well knew that the owner of the pears was Mr. Boyles. The contract itself describes the fruit as Boyles' pears, coming from his orchard, and it is generally known in trade circles that brokers bargain for the sale of the owners' products on a brokerage basis. This was true of the Exchange. The defendant and the California Fruit Exchange had had many business transactions through the years and each was familiar with the methods of doing business on a brokerage basis. Besides, early in the transaction Kingsbaker treated with Boyles as the owner at

the time Boyles appeared in protest of Kingsbaker's claim to the effect that the fruit was not up to grade. Later he received a letter from Boyles in which he was threatened with suit unless he made prompt payment for the fruit in accordance with the terms of the contract. He did not question Boyles' ownership at times when he was called upon to do so. Boyles' orchard was well known to him for the excellence of its production and the Exchange, as he must have known, was but the means of transferring possession from the owner to the buyer. He first raised the question after action was filed. The case was tried upon the theory that Boyles was the owner of the pears and defendant suffered no surprise or prejudice·by the fact that the contract was made in the name of the Exchange, which was the agent of Boyles.

■ It is contended by appellant that the rule announced in cases where a person who contracts for the delivery of goods or property of a certain quality and description may refuse to accept any part of the property or goods unless all of them are in accordance with the contract, should rule the instant case, citing as supporting authorities *Morrison, McIntosh & Co.* v. *Leiser,* 73 Mo. App. 95; *Lindsbory Milling & Elevator Co.* v. *Danzero,* (Mo. App.) 193 S. W. 606; *Louisville Packing Co.* v. *Crain,* 141 Ky. 379 [132 S. W. 575]. It is not necessary to decide whether the rule announced above, which may have been applicable to the facts of the cited cases, is a proper criterion for the interpretation of the contract in the instant case. Whatever fault Mr. Kingsbaker may have found with the first or second carload of fruit became a closed chapter by mutual agreement between Mr. Kingsbaker and Mr. Boyles, the owner of the fruit. Their compromise of matters involved in that dispute could not form the basis of a new complaint or enter into a future controversy, as it was settled with the consent of all without any intimation on the part of Mr. Kingsbaker that he regarded it as grounds for declaring the contract at an end. It is true he expressed himself as dissatisfied with the fruit. On the other hand, Mr. Boyles maintained that the fruit was well within the contract from the first to the last carload. The acts of Mr. Kingsbaker looking to a refusal to accept any more fruit did not become manifest until after the arrival of the third and other carloads which followed. If car three and the others were within the grade provided in the contract,

and there is undeniably evidence in the record to that effect, then the question as to whether Mr. Kingsbaker did or did not make a rescission which met the form and requirements of law is wholly out of the case. If the fruit was up to grade, as found by the trial court, there was no other alternative left but to pay the contract price.

As to the claim that the contract was rescinded by the mutual consent of Mr. Kingsbaker and Mr. Henney, we find nothing in the record granting Mr. Henney, who was a mere broker and salesman for the Exchange, such power. Neither did he openly attempt to rescind. It is true that he did give testimony to the effect that in his opinion the pears were not up to the grade called for by the contract, but it cannot be said that he assumed the responsibility of canceling the contract. In fact, he made it clear to Mr. Kingsbaker that he had no such authority. He conferred with both Mr. Boyles and the Exchange on important phases of the transaction. Mr. Kingsbaker must have known from the contract and from his conference with Mr. Boyles very early in the transaction that the title to the pears was in Mr. Boyles.

The appellant suffered no prejudice by reason of the court's charge or its refusal to give any instruction requested by it.

All of the rejected fruit was sold on the open market at a price less than the contract price. The difference between the latter price and the prices which the pears should have brought in the open market at Los Angeles, giving consideration to the cost of marketing, was held properly to be the criterion of damage. Two carloads were shipped to New York City for reasons already stated, were there inspected and found to be number one grade.

We find no sufficient reason for disturbing the judgment. It is, therefore, affirmed.

Curtis, J., Langdon, J., Shenk, J., and Waste, C. J., concurred.

Rehearing denied.