PIERSON AND COMPANY, Respondent, *v.* AMERICAN STEEL EXPORT COMPANY, Appellant.

First Department, December 24, 1920.

Sales — action by seller to recover for anticipatory breach — waiver of time of performance — notice requiring performance within reasonable time as prerequisite to right to cancel — cancellation on specified ground — waiver of other objections.

In an action by a seller to recover damages for an anticipatory breach of the contract by the buyer in which it appeared that the buyer in canceling the contract took the position that it would not take deliveries because of the inability of the seller to make deliveries during the delivery period, the evidence examined, and *held*, that the defendant had waived the time for delivery provided for in the contract.

The buyer having waived the time of performance it could not thereafter cancel the contract without notice to the seller requiring performance within a reasonable time, and not having given such notice its rescission was not warranted and its act of cancellation constituted an anticipatory breach of the contract.

The buyer having canceled the contract on a specified ground, all other objections are deemed waived, and, in an action to recover for the breach, his right to cancel must be limited to the ground specified.

APPEAL by the defendant, American Steel Export Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 22d day of April, 1920, upon the decision of the court rendered after a trial at the New York Trial Term, the parties having consented in open court to the discharge of the jury, and also from an order entered in said clerk's office on the 20th day of April, 1920, amending the decision.

*Merton E. Lewis*, for the appellant.

*Frank S. Gannon, Jr.*, of counsel [*Robert L. Redfield* with him on the brief]; *Hill, Lockwood & Redfield*, attorneys, for the respondent.

GREENBAUM, J.:

The action was brought to recover damages for an anticipatory breach of contract. In April, 1917, the plaintiff agreed

to sell and the defendant to buy a quantity of checkered steel plates which it was understood by the parties were intended for export to Japan, shipments to be made during June and July, 1917. The contract consisted of two orders numbered 201 and 237 respectively. On June ninth, twelfth, eighteenth and twenty-first the defendant wrote to the plaintiff requesting it to make special effort to make delivery of all the goods during that month, the reason given being that the freight arrangements of the defendant at the Pacific coast called for clearance during the month of July.

On June twenty-third the plaintiff wrote to the defendant as follows: " We wish to advise that we cannot at the present time definitely advise date of shipment. We expect to have a rolling of these plates about the middle of July, and we hope to get the shipment away during the latter part of next month, which we trust will be in time for your requirements." On July fourteenth plaintiff further wrote to defendant calling attention to the fact that it would be unable to roll the pattern plates before some time in August due to the fact that " on our last rolling of this pattern we broke our roll, as well as some machinery, parts of which we have been unable to replace. The very earliest that we expect to be rolling this pattern will be the early part of August, and as soon as we do commence rolling will be glad to give attention to these orders. * * * We hope that you will be able to arrange with your customer to have your credit extended as well as satisfactorily explaining the cause of the delay which is evidently not a fault of the mill."

On August 6, 1917, the defendant wrote to the plaintiff that it had secured a United States government export license issued on August third and expiring August fifteenth covering ten tons of plates and also inquiring, " Will you see what you can do towards getting shipment away before expiration date? " Defendant wrote on August seventh, the following day, calling attention to the fact that it had received United States government export license for forty-six gross tons of sunken diamond floor plates, at the same time asking, " Will you see what you can do towards getting shipment forward before expiration date? "

On August eighth plaintiff replied: " It will be utterly

impossible for us to prepare these plates and have ready for shipment by the 10th and have the bill of lading dated previous to the 15th inst. We would be pleased to accommodate you if it would be possible to do so; but we regret to advise that there have been so many export licenses ahead of this one that the mill say they cannot .get out the tonnage. They expect, however, to have a rolling about the 20th or 25th of this month and will include your plates in this rolling and will endeavor to give them preference. * * * We trust that you appreciate the circumstances under which we are working, and we would also like to know if you can secure for us government license effective after Aug. 15th, so that we can proceed with the rolling of this order."

The defendant replied to the letter of the eighth as follows: " We wish to state that we have applied for United States Export Government Licenses on these orders and will endeavor to secure extension as you request. We appreciate the existing conditions, and hope to have the new license before this rolling comes around."

On August 23, 1917, plaintiff wrote to the defendant: " Referring to your orders #237 and #201 for Sunken Pattern Floor Plates, we are of the impression that we can roll these plates Saturday, the 25th inst. or the early part of next week, providing you have a government license. Are you able to secure this information? If so, please telephone us the license number."

On the following day, August twenty-fourth, defendant replied that, " up to the present date we have not received United States Government License for these orders. We have the matter up now, and just as soon as we have the license number, we will advise you."

On September 4, 1917, the defendant wrote to plaintiff two letters, one referring to order 201 and the other to order 237, each of which read as follows: " Owing to the President's recent proclamation embargoing plates for export, please suspend manufacture of the material on this order until further advised. If we are successful in securing an export license, the number will be sent to you immediately upon receipt of same."

On the following day, September fifth, plaintiff replied:

" We have your two letters of the 4th inst. referring to orders #201 and #237. We note that you require a suspension on these orders. We have accordingly passed this information on to the mill, but please understand if they suspend this material now that it may be three or four months before they can schedule it again for rolling. We are advancing you this information so that you can be kept posted on the progress of the order."

There appears to have been no answer to this letter by the defendant. On November 3, 1917, defendant wrote two letters of similar import to plaintiff referring to the respective orders reading as follows: " Kindly change the instructions applying on the above order to read as follows: Consign to: Order American Steel Export Company, Yokohama, via Seattle. Japan. All other instructions to remain unchanged. Acknowledge receipt of these instructions and oblige."

The only difference between the two letters was as to the place of consignment, the second order, 201, reading, " Kobe, Japan," instead of " Yokohama."

On November fifth plaintiff acknowledged receipt of the two letters of the third inst. in which it stated: " We note you have given us revised instructions and we have accordingly passed these to the mill; but please understand we are doing nothing with these orders until you favor us with licenses covering both of these. Would like to know if your customer would be willing to take these orders on an inland bill of lading, having the plates marked but no mention made on the bill of lading that they are for export. You, of course, understand that you will have to pay the domestic rate of freight."

On November nineteenth the defendant wrote to plaintiff additional instructions with respect to the two orders. The plaintiff replied on the following day, November twentieth, acknowledging receipt of the revised instructions and that it would communicate them to the mill and also asked whether the defendant would be willing to take inland bill of lading or " do you intend to wait for Federal license? " On the same day, November twentieth, defendant advised the plaintiff that the orders were at that time to be shipped freight prepaid and asked that this be changed to read freight collect; and on November 21, 1917, in answering the plaintiff's letter of November twentieth, the defendant wrote: " We cannot allow

you to ship this order on Domestic Bill of Lading, as it is against the government's instructions to forward material for export in this manner. We will have to wait until the Government Export License has been issued. As soon as we have this we will advise you."

Plaintiff replied to the letter of the twenty-first on the following day, November twenty-second, that it had taken note of what had been stated in that letter and also that: " We do not quite understand this, as we are making shipments at the present time to the various points on the Pacific Coast, marking bill of lading ' For Export ' and a notation on bill of lading that the export declaration is to be furnished by the forwarding agent at port. The mill tell us that they can get out these two orders in four to six weeks after receipt of your advices to either go ahead on a domestic basis or if you can present us with a government license. This promise, of course, is based upon the condition that U. S. Government orders are to be given priority. There have been so many changes both as to destination and freight, etc., on these two orders that we wish you would kindly write us a letter stating just how you want the goods forwarded now, that is, we understand the freight is to be collect and other conditions. We think it would be better to have you write us letter, as above requested, so that no mistakes will occur at the mill owing to the many changes."

Defendant replied by letter on November 23, 1917, referring to a letter sent out by the War Industries Board, which it is unnecessary to detail, concluding as follows: " In connection with the shipping instructions on these orders, it will probably be well to hold this matter in abeyance until licenses are secured at which time we will give you corrected instructions. It is entirely probable, however, that in view of the present situation both of these orders will have to be cancelled as a result of our credit expiring and owing to the fact that licenses have not been, and probably will not be, secured on this tonnage."

Plaintiff replied to this letter on November twenty-fourth, the following day, acknowledging receipt of the defendant's letter of the twenty-third. The first portion of the letter applies to the comments made by the defendant as to the War

Industries Board, which I do not think is material to the legal questions involved, and plaintiff concludes this letter as follows: " However, we will let the order remain until you are able to secure a license or until the mill presses us hard for shipping instructions that we will be obliged to take it up with you again."

On November twenty-sixth the defendant wrote to the plaintiff in reply to the letter of the twenty-fourth discussing the matter of the rule of the War Industries Board and concluding as follows: " Our letters of credit on these orders expire on November 30th, and December 7th respectively, and if licenses are not issued in time to make shipment within these dates we will be obliged to cancel the orders."

The licenses referred to are those which the defendant was obliged to secure from the Federal government. On November thirtieth the plaintiff replied to the letter of the twenty-sixth in which it again discussed the War Industries Board matter and then stated the following: " Referring to second paragraph of your letter of the 26th inst. we further note that your credits will expire on these two orders November 30th and December 7th; and if the licenses are not issued you will be obliged to cancel the orders. We thought you were entirely familiar with the conditions surrounding these orders and purchases, especially so of tank plates, floor plates and sheets, that all purchases made are firm, non-cancellable and that an order once entered is to remain so until the proper time arrives and licenses are secured for shipment. The mill will not allow us to cancel this tonnage; and, therefore, we cannot comply with your request. We think, under the circumstances, you had better secure an extension of your credits and also work to some end to secure a license to have these plates shipped. Please understand that this tonnage will remain on the mill's books until you are able to give us government licenses and disposition."

On December 5, 1917, the defendant wrote to the plaintiff as follows: " Referring to the above orders [201 and 237] which you have been unable to forward during the delivery dates promised on account of the governmental embargoes, you will kindly arrange to cancel same as our credits covering these orders have expired."

On December seventh plaintiff replied acknowledging receipt of defendant's letter of the fifth as follows: " We note that you are requesting cancellation of these two orders owing to the fact that your credits have expired.   We wish that you would kindly refer to past correspondence that we have had surrounding these two orders, and you will readily see that it is impossible for us to accept cancellation of these two orders. We would be glad to meet your views if it was within our power to do so,  but the mill  absolutely refuse to accept cancellation, and as you are familiar with the purchases of steel plates made in the last year or two, in which all sales were made firm and non-cancellable, we did not expect you to ask us to make cancellation.   Kindly refer to recent corre- spondence on these two orders in which we ask you to have your credit extended and that we would leave the tonnage with the mill to be shipped at the first opportunity after government restrictions were released somewhat.   Please acknowledge this communication, stating that you will allow these orders to remain for shipment at some future time and that also you will arrange for extension of  credits."

On the following day, December eighth, the defendant wrote to plaintiff, after acknowledging receipt of its letter of the seventh, " we beg to advise that your suggestion in regard to leaving these orders on your books for an indefinite period is one to which we cannot agree.   Kindly note that owing to your inability to make shipment during the delivery period our only recourse is cancellation.   We will be very glad, however, in the future to reinstate these orders with you if customers are willing to take the same action with us."

This completes the correspondence between the parties. By its letter of  December eighth the defendant in effect took the final position that it would not take any future deliveries and based its action upon the " inability " of the plaintiff to make shipments during the delivery period.   There can be no doubt whatever that there had been a waiver of the time of delivery provided for in the contract.   The defendant waived delivery of these contracts in its earlier letters upon plaintiff's inability to deliver in June and July and thereafter owing to the alleged embargo by the United States government and the

difficulties on the part of defendant to procure licenses, the time for delivery was extended from time to time by consent of both parties.

The rule is well settled that where time of performance is waived " neither party can thereafter rescind the contract on account of such delay without notice to the other requiring performance within a reasonable time, to be specified in the notice, or the contract will be abrogated." (*Taylor* v. *Goelet,* 208 N. Y. 253.) No such notice was here given by the defendant. It follows, therefore, that its rescission was not warranted in law and that its act of cancellation constituted anticipatory breach of the contract which entitled the plaintiff to recover damages therefor.

It is also well settled that where one breaches a contract upon specified ground, his right so to do must be limited to the ground specified.

In *Littlejohn* v. *Shaw* (159 N. Y. 188, 191) the court in its opinion said: " The defendants placed their rejection of the gambier [referring to goods which were the subject-matter of that action] upon two specific grounds, viz: that it was not of good merchantable quality and that it was not in good merchantable condition. By thus formally stating their objections, they must be held to have waived all other objections. The principle is plain, and needs no argument in support of it, that if a particular objection is taken to the performance and the party is silent as to all others, they are deemed to be waived."

In *Hess* v. *Kaufherr* (128 App. Div. 526, 527) the court said: " When the refusal to accept purchased goods is based upon particular objections, formulated and deliberately stated, all other objections are deemed waived, and the vendor to recover the price need only prove compliance with the contract of sale in the particulars covered by the stated objections." (*Littlejohn* v. *Shaw, supra.*)

The judgment and order should be affirmed, with costs.

Clarke, P. J., Laughlin, Dowling and Merrell, JJ., concur.

Judgment and order affirmed, with costs.