PIERSON & Co., INC., Respondent, *v.* NEDERLANDSCH-INDISCHE
MAATSCHAPPIJ TOT VOORTZETTING DER ZAKEN VAN DER LINDE
& TEVES EN R. S. STOKVIS & ZONEN, LIMITED, Known as and
Doing Business under the name of "LINDETEVES-STOKVIS,"
Appellant.

First Department, November 17, 1922.

Sales — action to recover damages for anticipatory breach of contract
to manufacture and sell steel plates — plaintiff had not manufactured
plates or caused them to be manufactured at time of alleged breach —
assuming that breach was wrongful, measure of damages under Personal
Property Law, § 145, subd. 4, was loss of profit and not difference between
contract price and market price.

In an action to recover damages for an anticipatory breach of a contract to
manufacture and sell steel plates, the plaintiff's measure of damages, where it
had not manufactured any of the plates or caused any of them to be manu-
factured at the time of the alleged breach, was, under subdivision 4 of section
145 of the Personal Property Law, assuming that the breach was wrongful,
the profit that it would have made if the contract of sale had been fully per-
formed and not the difference between the contract price and the market price
at the place of sale and time of the breach.

APPEAL by the defendant, Nederlandsch-Indische Maatschappij
tot Voortzetting der Zaken Van Der Linde & Teves en R. S. Stokvis
& Zonen, Limited, from a judgment of the Supreme Court in
favor of the plaintiff, entered in the office of the clerk of the county
of New York on the 14th day of December, 1921, upon the verdict
of a jury rendered by direction of the court.

*Leventritt, Riegelman, Carns & Goetz* [*David Leventritt* of counsel;
*Charles A. Riegelman* with him on the brief], for the appellant.

*Hill, Lockwood & Redfield* [*Dominic B. Griffin* of counsel; *Robert L.
Redfield* with him on the brief], for the respondent.

PAGE, J.:

The action was to recover damages for an anticipatory breach
of two contracts for the sale of certain steel plates to be manu-
factured. The complaint alleged that the material was respec-
tively intended for export to China and to Batavia, Dutch East
Indies. The terms of the contracts must be ascertained from the
correspondence of the parties; that relating to the first commencing
on April 12, 1917, with a request for quotations on 975 sheets of
"mild steel ship plates" of various sizes and quantities destined
for China, and culminating in an order for deliveries in May-
June, 1917, for all sizes except the one-eighth of an inch, and
for the latter delivery in July, 1917, and an acceptance (April

twenty-fifth) specifying that the one-eighth and three-sixteenths were to be shipped during July or August and the remainder of the material in May or June, providing plaintiff received the marks promptly and definite shipping instructions, as otherwise the mill would be unable to enter the order until the information had been received. The shipping marks were furnished on May 4, 1917, and the shipping instructions were furnished the plaintiff on May 29, 1917. On June 7, 1917, the plaintiff wrote the defendant acknowledging the receipt of these letters and stating "we have requested the mill to ship the material on this order in carload lots of 80,000 lbs." The plaintiff did not ship the goods within the time called for by the contract. On July 13, 1917, it wrote that they had been advised that the mill "hoped to be able to ship by July 21st to August 4th;" but on the next day wrote that they were advised by the mill that it would be necessary to obtain a government license for shipment of the goods as they were intended for export "before they will be able to proceed with the rolling of the material." The obtaining of the government license was rendered necessary because of the Embargo on Exports Proclamation of the President of the United States, issued July 9, 1917, requiring such a license on shipment, among other goods, of steel ship plates and structural shapes to specified countries, including China and The Netherlands, her colonies, possessions, or protectorates. (See 40 U. S. Stat. at Large, 1683.) There was thus introduced a complication in the performance of the contract, which did not exist at the time the contract was entered into and which would not have interfered with the delivery of 375 plates of the heavier grades if the plaintiff had performed within the contract period. The defendant, however, did not exercise its right to terminate the contract for the plaintiff's failure to perform, but obtained a government license for the shipment of all the steel covered by the contract which amounted in weight to about one hundred and thirty-five tons. The plaintiff shipped about fifty-five tons under this license in August, 1917. It then became necessary for the defendant to surrender the license and to obtain a new license to permit the shipment of the remaining eighty tons which they endeavored to obtain but were unable to do. The plaintiff wrote that they would arrange to roll and forward the goods within four weeks after receiving the government license. On September 13, 1917, the plaintiff wrote to the forwarding agent of the defendant: "We might mention to you that none of this material is made yet; but we can roll and ship in four or five weeks after receipt of government license."

And on the next day wrote to defendant: " We wish to advise that some of this material has been made and anything you can do to hurry the export license will be appreciated."

Several letters passed between the parties while the application for the license was pending. On November 21, 1918, the defendant notified the plaintiff that they had been unable to obtain the license, and, therefore, they found it necessary to cancel the order. On November 26, 1918, the plaintiff wrote to defendant: " We are not in any way responsible for any action of your customer toward you, and we shall look to you to supply us with the license to enable us to ship the plates as we cannot accept cancellation under any consideration, and provision has been made for the raw material for the fulfillment on the mill's part of our order covering this tonnage."

Without going into the details, the second contract was for a quantity of steel sheets and checkered floor plates, which was entered into after it became necessary to obtain the government license. It would appear from the correspondence that the plaintiff never scheduled these plates for rolling at the mill, refusing to do so until they received the license.

The plaintiff was allowed on the trial to amend its complaint to increase the demand for judgment in the original complaint for breach of the first contract to $9,200 from $1,600 and for breach of the second contract to $1,650 from $1,025. The original complaint was framed on the theory that the plaintiff was entitled to recover the profit which the plaintiff would have received had the contract been fully performed, whereas the theory of damages in the amended complaint was that the plaintiff was entitled to recover the difference between the contract price and the market price at the place of sale and time of the breach. The latter theory of damages was adopted by the trial court, and the trial, through the exclusion of evidence, resolved itself into a question of the amount of damage, and the court directed a verdict for the plaintiff for the full amount claimed in the amended complaint. This was erroneous. Section 145 of the Personal Property Law (as added by Laws of 1911, chap. 571), which is known as the Sales Act and the Sales of Goods Act, reads as follows:

" § 145. Action for damages for nonacceptance of the goods.

" 1. Where the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for nonacceptance. * * *

" 4. If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell or the sale, the buyer repudiates the

contract or the sale, or notifies the seller to proceed no further therewith, the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing toward carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand. The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages."

The plaintiff had not manufactured nor caused the goods to be manufactured, and conceding for the purposes of this appeal, but not deciding, that defendant wrongfully refused to accept the goods, the measure of damages would be the profit the plaintiff would have made had the contract of sale been fully performed. This rule applies as well to one who contracts to have the goods manufactured as to the manufacturer. (*Hausman* v. *Buchman*, 189 App. Div. 597, 602, and cases cited; *Commoss* v. *Pearson*, 190 id. 699, 702.) In the case of *Pierson & Co.* v. *Am. Steel Export Co.* (194 App. Div. 555), cited by respondent, the question of the measure of damages was not considered. There were only two points determined in that case: *First*, that the buyer having waived time of performance, it could not thereafter rescind the contract without notice of reasonable time within which to perform, and not having given such notice, its notice of rescission was unwarranted and its act of cancellation was an anticipatory breach; *second*, the buyer having canceled the contract on a specified ground, all other objections are deemed waived, and the right to cancel must be limited to the ground specified.

The instant case having been tried and determined on an erroneous theory of damages, we cannot modify the judgment, for no evidence was received tending to show the profit that the plaintiff would have made had the contracts been performed.

Inasmuch as there is to be a new trial, we do not pass upon the other points discussed by counsel, but leave those for determination by the trial court when the facts are more fully developed than they were on this trial, unembarrassed by any expression of our opinion upon the record before us.

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

CLARKE, P. J., DOWLING, MERRELL and FINCH, JJ., concur.

Judgment reversed and new trial ordered, with costs to appellant to abide the event.