## LAGERLOEF TRADING CO., Inc., v. AMERICAN PAPER PRODUCTS CO. OF INDIANA.*

(Circuit Court of Appeals, Seventh Circuit. May 2, 1923. Rehearing Denied July 9, 1923.)

No. 3183.

1. **Appeal and error ☜931(1)—Findings presumed to be supported by evidence received without objection to complaint.**

In the absence of any contrary showing in record, the trial court's finding of facts carries the presumption that the trial court received evidence on which to base the finding, without any objection on defendant's part as to form or substance of the complaint or as to variance between pleading and proof, and therefore the only question is as to the rights of the parties on the facts found.

2. **Sales ☜370—Buyer's rejection is converted into anticipatory breach by suit before time for performance expired.**

Where the buyer of goods unconditionally canceled his order and gave notice he would not accept the goods, the action of the seller in bringing suit for breach of the contract, before the time within which the goods might have been delivered under the contract had expired, converted the buyer's anticipatory rejection of the contract into an anticipatory breach, for which the seller was entitled to recover.

3. **Sales ☜81(7)—Buyer held obligated to arrange for transportation from dock.**

Where a contract for sale of goods to be imported fixed the price on the dock at an Atlantic seaport, payment to be within 30 days from the date of inland bill of lading, it was the duty of the seller's agent to inform the buyer when a shipment was expected to arrive at the dock, and the buyer was obliged to be there to receive the shipment and arrange for its inland transportation.

4. **Sales ☜153—Buyer's refusal to attend at dock held breach, excusing seller's further performance.**

Where a seller had shipped the goods sold, and had notified the buyer of the probable date of arrival of the goods at the dock, where the buyer was obliged to receive them, the buyer's failure to be present to receive the goods was a breach, which prevented or excused the seller from further performance; it not being the seller's duty to make an actual tender by its transporting the goods inland to the buyer's place of business.

5. **Sales ☜372—Seller's recovery for buyer's anticipatory breach is not defeated by seller's attempts to perform.**

Where the buyer of goods seeks to cancel his order, and gives an unqualified notice he will not receive the goods, the action of the seller in

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 44 Sup. Ct. 34, 68 L. Ed. ——.

thereafter transporting the goods to this country and giving notice to the buyer of their arrival merely indicates his ability and willingness to perform, and elects to give the buyer an opportunity to repent, but does not thereby waive his right to recover from the buyer for the anticipatory breach of the contract, or oblige himself fully to perform his part of the contract, notwithstanding such breach.

. In Error to the District Court of the United States for the District of Indiana.

Action at law by the Lagerloef Trading Company, Inc., against the American Paper Products Company of Indiana, for breach of contract. Judgment for defendant, and plaintiff brings error. Reversed, with directions to enter judgment for plaintiff.

Finnish Cellulose Association was a manufacturer of pulp in Finland. Lagerloef Trading Company was an importer at New York, and was the agent of the Finnish Association in selling pulp in this country. These parties will be called "seller."

Carthage Board & Paper Company was a manufacturer of paper in Indiana. American Paper Products Company of Indiana was Carthage Company's successor in interest. These parties will be called "buyer."

Seller sued buyer on breach of contract. Jury was waived, and the trial court made a finding of facts, on which it based a conclusion of law and a judgment that seller take nothing.

The finding of facts is as follows:

### I.

That under date of August 25, 1920, the plaintiff and the defendants entered into a contract, in writing, known to the plaintiff as contract No. 491, which written contract is in the words and figures following:

"Hans Lagerloef, President and Treasurer.
"Orvar Hylin, Vice President.
"Lagerloef Trading Company, Inc.,
"18 East 41st Street.  ·

"Order 9064.                                        Telephones: ·
                                          "Murray · Hill 4246–4247
                                          "New York, August 25, 1920.

"Contract No. 491.  1920.

"Carthage Board & Paper Co., Carthage, Ind.—Gentlemen: As per telegrams exchanged and our letter of even date, we confirm having sold you, for account of the Finnish Cellulose Association, viz.:

"Quantity and description: Three hundred (300) long tons of No. 1624 'Gutzeit K' or 'Gutzeit KK' prime strong unbleached sulphate our option (manufactured in Finland).

"Time and mode of shipment: To be shipped at the rate of one hundred (100) tons per month December, January, and February from abroad.

· "Price: Seven dollars ($7.00) per hundred pounds air-dry weight ex dock American Atlantic Seaboard.

"Terms of payment: Net cash thirty days from date of inland B/L. All remittances payable in New York City funds.

"Remarks: Subject to the conditions printed on the back hereof.
"New York, N. Y., August 25, 1920.
                              "Lagerloef Trading Company, Inc.,
                                  "[Signed]  O. Hylin, V. Pres.
"Accepted:            Carthage Board & Paper Co.,
                          "[Signed]  H. C. Baseler, General Manager.

"Conditions. .

"(1) Weight: In all instances where the word 'tons' occurs in this contract, it is understood to refer to a ton of 2,240 pounds air-dry weight.

"(2) Moisture: All pulp to be billed on air-dry weight, and the term 'air-dry' shall mean 90 per cent. absolutely dry pulp and 10 per cent. of atmospheric moisture.

"(3) Tests: In case buyer's weight and test differs from invoice and is not acceptable to buyer, pulp is to be held and seller notified by telegram of the result claimed. Upon request, the seller will make joint test with buyer. There shall be no claim where a difference from original billing does not exceed 1 per cent. With regard to settlement, it is based on result so obtained. The cost of investigation is to follow results and be paid by the party in error. In all claims for damaged pulp, purchaser hereby agrees to hold railroad carrier responsible, unless it is proven that said pulp was defective when delivered to said carrier by the seller.

"Each party to appoint an arbitrator, who shall be well acquainted with the pulp business, and they to appoint their umpire before proceeding with the hearing. If either party fails to appoint their arbitrator within 10 days of notice in writing requiring him to do so, the arbitrator appointed by the other party shall without umpire act for both; his decision to be binding upon both parties, as if he had been appointed by consent. It shall be left to the arbitrators, in case they agree that the pulp is not within reasonable limits of the quality sold, to decide whether or not the pulp shall be rejected or taken with an adequate allowance.

"Furthermore, it shall be left to the arbitrators to agree upon the place of arbitration.

"(5) Shipment: Each shipment under this contract is to be considered a separate contract, and default on one or more shipments not to invalidate the rest of the contract.

"(6) Tariff: This contract is based upon the tariff law existing at the time of signing same, and in case of any change the buyer to have the benefit of any reduction made or to pay any duties imposed or any increase.

"(7) Force majeure: The buyers or sellers may suspend deliveries 'under this contract pending any contingency beyond their control, which prevents or hinders the manufacture of paper or the manufacture or delivery of pulp, viz.: The act of God, war, strikes, lockouts, drought, flood, accidents, total or partial fire obstruction or navigation by ice at port of shipment and loss and detention at sea or the like. The party affected shall give prompt notice to the other party of the cause and commencement of such suspension in writing or by wire, and also of when it ceases to have effect, and deliveries shall be resumed pro rata according to the production of the sellers or the consumption of the buyers. When such suspension shall have continued for one calendar month, the delivery for that period shall be canceled, unless otherwise agreed. For each succeeding period of one month, the same course shall be taken. In the case of single cargoes or deliveries at longer intervals than one month, one-twelfth of a year's deliveries shall be canceled for each month's suspension. Shipments in transit must, however, under all circumstances, be accepted by the buyer.

"(8) Claims: All claims of whatever nature must be made to the seller in writing or by wire inside 15 days after receipt of the pulp at seaside or at buyer's station or mill; otherwise, the seller shall not be liable.

"(9) This agreement shall extend to and be obligatory upon the heirs, executors, administrators, successors, and assigns of the respective parties hereto.

"(10) Breach of contract: Should the buyers without legal reason omit to take delivery or pay for pulp at stipulated time, the sellers may at their option withhold or refuse to make further deliveries."

Which contract is set out in paragraph 1 of plaintiff's complaint, and that as of the same date, the same parties entered into a written contract, known

to the plaintiff as contract 490, which said written contract is set out in the second paragraph of complaint, and is in the words and figures following, to wit:

"Hans Lagerloef, President and Treasurer.

"Orvar Hylin, Vice President.

"Lagerloef Trading Company, Inc.,

"18 East 41st Street.

"Order 9063.

Telephone:

"Murray Hill 4246–4247.

"New York, August 25, 1920.

"(490)

"Contract No. 90.  1920.

"Carthage Board & Paper Co., Carthage, Ind.—Gentlemen: As per telegram exchanged and our letter of even date, we confirm having sold you, for account of the Finnish Cellulose Association, viz.:

"Quantity and description: Six hundred (600) long tons of our No. 1670 'KssF' prime strong Kraft pulp (manufactured in Finland).

"Time and mode of shipment: To be shipped at the rate of two hundred (200) tons per month December, January, and February from abroad.

"Price: Seven dollars and fifty cents ($7.50) per hundred pounds air-dry weight ex dock American Atlantic Seaboard.

"Terms of payment: Net cash thirty days from date of inland B/L. All remittances payable in New York City funds.

"Remarks: Subject to the conditions printed on the back hereof.

"New York, N. Y., August 23, 1920.

"Lagerloef Trading Company, Inc.,

"[Signed]  O. Hylin, V. Pres.

"Accepted:

Carthage Board & Paper Co.,

"[Signed]  H. C. Baseler, General Manager."

The remainder of the contract is the same as the conditions to contract 491 heretofore set out.

## II.

That after the execution of said contracts, and long before the date fixed for the performance thereof, to wit, on the 19th day of October, 1920, the defendant notified the plaintiff, as agent of the Finnish Cellulose Association, in writing, that it would not perform the contracts on its part, and that it would not receive or pay for the pulp, described in said contracts; that defendant repeated said statement to the plaintiff on December 6 and December 28, 1920; that the refusal on the part of the defendant to carry out said contracts was positive and unequivocal.

## III.

That on receipt of the first notice, referred to in finding II, the Finnish Cellulose Association, through plaintiff as its agent, refused to treat said notice as a breach of the contract, in so far as performance on either side was concerned, but, on the other hand, it notified the defendant that it would not consent to a cancellation of the contract, and offered to make deliveries under said contract long after said notice of refusal was given. Thereafter the defendant, at all times, persisted in its original refusal to carry out the contracts on its part, and the Finnish Cellulose Association through the plaintiff, as its agent, at all times, persisted in standing on the contracts and enforcing them according to their terms.

## IV.

The court further finds that on December 31, 1920, the Finnish Cellulose Association, through plaintiff as its agent, notified the defendant, by letter, that the December shipment to apply against contract 490 was then on dock at Philadelphia, and that the December shipment to apply against contract 491 was then on the water in steamship Osage; contract 490, mentioned in said notice, referred to the contract for the sale of No. 1670 KssF prime

strong Kraft pulp, set out in paragraph 2 of the complaint, and contract 491. mentioned therein, referred to the contract for the sale of No. 1624 Gutseit K or Gutseit KK prime strong unbleached sulphate, set out in the first paragraph of complaint; that on January 4, 1921. Finnish Cellulose Association by plaintiff as its agent, by a telegram notified the defendant that the steamer Osage was due on January 5, 1921, and requested shipping instructions. stating that plaintiff could sell the pulp for account of defendant at $80 per ton dock and asking defendant to wire instructions.

### V.

The court further finds that neither the Finnish Cellulose Association nor the plaintiff had on dock, at Philadelphia, or on any dock on the Atlantic seaboard 200 long tons No. 1670 KssF prime strong Kraft pulp, which had been shipped from abroad, in the month of December, at the time of giving the notice, as found in finding No. IV, or at any other time.

At the time of giving said notices, as shown in finding No. IV, there was in the steamer Osage, then on the water, ninety-three (93) long tons of No. 1624 Gutseit K prime strong unbleached sulphate pulp which had been shipped from abroad in December. 1920, to apply on contract 491, and which arrived at the Atlantic seaboard and was placed on the dock, at Philadelphia, on January 6, 1921, and which was shipped to the River Raisin Paper Company on January 7, 8, and 11, 1921. The 93 tons of Gutseit pulp, mentioned, was not on any dock on the Atlantic seaboard of the United States at the time said notice was given, and after the arrival of said pulp, on the dock at Philadelphia, no further notice was given of such arrival. or of the particular dock, and the Atlantic seaboard, where it had been placed.

### VI.

On receipt of the notices, shown in finding No. IV. the defendant, by telegram, notified the plaintiff, as agent of Finnish Cellulose Association that it had been repeatedly advised that the defendant disclaimed any liability in regard to the pulp mentioned.

The defendant gave no shipping order for the pulp mentioned, and declined to receive the same under the contracts. The only reasons for declining to perform said contracts, theretofore given by defendant, were that it was not bound to receive any pulp thereunder, and at no time did the defendant place its refusal to receive pulp on the ground that the pulp had not been shipped at the proper time or was insufficient in quantity.

### VII.

On February 18, 1921, plaintiff as agent for the Finnish Cellulose Association, notified the defendant by letter that it had received. under defendant's contract of August 25th, two hundred tons of No. 1670 KssF prime strong Kraft pulp, which goods were then on the P. & R. R. R. Pier No. 27, Philadelphia. By the same letter, it also notified the defendant that it had also in a vessel, then on the water, which sailed from abroad in January, 100 tons of 1624 Gutseit K prime strong unbleached sulphate, and further stated in said letter that said plaintiff would hold said pulp until the close of business on February 21, to be advised if defendant wished to withdraw its cancellation and accept said merchandise.

Neither the plaintiff nor the Finnish Cellulose Association, at the time of giving the notice contained in said letter or at any other time, in the month of January or February, had on dock, at Philadelphia. 200 tons of No. 1670 KssF prime strong Kraft pulp, which had been shipped from abroad, either in the month of December or the month of January.

The vessel referred to in the notice, contained in said letter, as being on the water and as containing 100 tons of No. 1624 Gutseit K prime strong unbleached sulphate was the steamer Eastport, which docked at Philadelphia on the 10th day of March. 1921; that the pulp carried by said steamer Eastport was not on the dock at Philadelphia, or on any other dock on the Atlantic seaboard at the United States, prior to March 10, 1921.

## VIII.

That on receipt of notice, mentioned in finding No. VII, the defendant made no response thereto, and gave no orders or directions for the shipment of the pulp mentioned in said letter, and thereby refused to accept the pulp offered at that time.

## IX.

The pulp, described in the contracts, was all manufactured in the republic of Finland, and the length of time required to transport the pulp from Finland to the Atlantic seaboard of the United States was from 21 days, as a minimum, to 40 days as a maximum.

## X.

The court further finds that there was on board the steamer Eastport more than 100 tons of No. 1624 Gutseit K prime strong unbleached sulphate and more than 200 tons of No. 1670 KssF prime strong Kraft pulp, and that said steamer Eastport sailed from Finland on the 30th day of January, 1921, all of which was consigned to plaintiff.

## XI.

The court further finds that neither the plaintiff nor the Finnish Cellulose Association, before the arrival of the steamer Eastport, gave to the defendant any notice as to the time when the pulp carried by the steamer Eastport would be placed upon any dock of the Atlantic seaboard of the United States, or as to the dock upon which said cargo would be placed, and after the arrival of said pulp on March 10th the plaintiff gave no notice to the defendant of the arrival of said pulp at the docks at Philadelphia, or as to the time when said pulp would be ready for delivery. The plaintiff never, at any time after the arrival of the pulp on dock, in March, 1921, offered to deliver to the defendant any of the pulp carried by the steamer Eastport, and the defendant never refused to accept said pulp after such time.

## XII.

The court further finds as a fact that at no time prior to March 10, 1921, did the Finnish Cellulose Association, or the plaintiff as its agent, have any Gutseit K or Gutseit KK pulp on any dock of any seaport of the United States, which had been shipped from abroad in either the months of December, 1920, January, 1921, or February, 1921, except the Gutseit K pulp which arrived on the steamer Osage on January 6, 1921, as stated in finding No. V, and also about 60 tons, which was shipped in February, and which arrived on the steamer Jackson on March 7, 1921, and the court also finds that at no time prior to said date did the Finnish Cellulose Association, or the plaintiff as its agent, have on dock, at any seaport on the Atlantic seaboard of the United States, any No. 1670 KssF prime strong Kraft pulp, which had been shipped from abroad in either the months of December, 1920, or of January or February, 1921.

## XIII.

The court further finds that, at all times during the months of December, 1920, and of January and February, 1921, the Finnish Cellulose Association had in the hands of its agent, the plaintiff, on the docks of the Atlantic seaboard of the United States more than four hundred (400) long tons No. 1670 KssF prime strong Kraft pulp, which had been shipped from abroad prior to December 1, 1920, and that, at all times during the month of December, 1920, and the first nine days of January, 1921, more than 200 long tons of No. 1624 Gutseit K prime strong unbleached sulphate, which had been shipped from abroad prior to the 1st day of December, 1920, but that it had no Gutseit K or Gutseit KK on any dock on the Atlantic seaboard of the United States, at any time after the 9th day of January, 1921, and before the 6th day of March, 1921; that all of the pulp of the brands mentioned in said contracts, which plaintiff had on dock, as herein found, was in all re-

-spects equal to pulp of like kind which might have been shipped from abroad in December, 1920, or in January or February, 1921.

## XIV.

The court further finds that during the entire months of December, 1920, and of January and February, 1921, the Finnish Cellulose Association had in Finland, available for shipment to the ports of the Atlantic seaboard of the United States, a sufficient quantity of No. 1670 KssF prime strong Kraft pulp of the kind and quality to have filled the specifications of the contract No. 490, had it been shipped in the months and in the quantities specified in the contract, and that it also had on hand, in Finland, during all of the same months, a sufficient amount of No. 1624 Gutseit K and Gutseit KK prime strong unbleached sulphate of the kind and quality to have filled the specifications of contract 491, had it been shipped in the months and in the quantities specified in the contract.

## XV.

The market value ex dock Atlantic seaboard of the kind of pulp described in contract 490, at the times when shipments thereof from abroad, made in December, 1920, January, 1921, and February, 1921, would in the ordinary course of business have arrived on the dock of the Atlantic seaboard was respectively as follows:

Four and $50/100$ dollars per hundred pounds for December shipments.

Four and $25/100$ dollars per hundred pounds for January shipments.

Four dollars per hundred pounds for February shipments.

The market value ex dock Atlantic seaboard, of the kind of pulp described in said contract 491, at the times when shipments thereof from abroad, made in December, 1920, January, 1921, and February, 1921, would in the ordinary course of business, have arrived on dock on the Atlantic seaboard, was respectively:

Four and $25/100$ dollars per hundred pounds for December shipments.

Four and $25/100$ dollars per hundred pounds for January shipments.

Four dollars per hundred pounds for February shipments.

## XVI.

On the 31st day of December 1920, the market value of KssF pulp, ex dock Philadelphia, was $5 per hundred pounds, and on January 5, 1921, the market value of Gutzeit K prime strong unbleached sulphate ex dock Philadelphia, was $4.75 per hundred pounds.

On the 21st day of February, 1921, the market value of KssF pulp, ex dock Philadelphia, was $4.25 per hundred pounds.

On the 10th day of March, 1921, the market value of Gutzeit K prime strong unbleached sulphate ex dock Philadelphia was $4.25 per hundred pounds.

## XVII.

The court finds that Finnish Cellulose Association, mentioned in said contracts, is a corporation of the republic of Finland; that plaintiff is a corporation of the state of New York, and defendant is a corporation of the state of Indiana; that plaintiff was at all times the duly authorized agent of said Finnish Cellulose Association; that on January 29, 1921, said Finnish Cellulose Association assigned to plaintiff all its interest in any right of action on the aforesaid contracts.

Herbert R. Limburg. of New York City (Charles Remster, H. H. Hornbrook, Albert P. Smith, Paul Y. Davis, and Kurt F. Pantzer, all of Indianapolis, Ind., on the brief), for plaintiff in error.

Moses B. Lairy, of Indianapolis, Ind., for defendant in error.

Before BAKER and PAGE, Circuit Judges, and LINDLEY, District Judge.

BAKER, Circuit Judge (after stating the facts as above).   [1] Among the conditions of the contracts the fifth provided that each ship-

ment was to be considered a separate contract and that default on one or more shipments should not invalidate the rest of the contract. Seller, intending to plead in conformity to the Indiana Code, filed a complaint in two paragraphs. Each paragraph stated the facts with respect to one of the two contracts. Each contract covered three shipments or installments. Buyer makes the point that separate consideration of the several installments required six paragraphs of complaint. Buyer further criticizes the complaint by insisting that it proceeds on the theory that seller, on receiving notice of buyer's anticipatory repudiation, elected to rely on making full and strict performance in accordance with the terms and conditions laid upon seller by the contracts. We find that the complaint set forth buyer's repeated, persistent, and unrepented repudiations of any and all obligations under the contracts, alleged seller's willingness and ability to perform, and counted on buyer's attitude and conduct as excusing full and strict performance. We do not burden these pages with an investigation of the requirements of the Indiana Code or with a copy of the complaint, because the finding of facts carries the presumption, in the absence of any contrary showing in the record, that the trial court received evidence on which to base the finding, without any objection on buyer's part as to form or substance of the complaint or as to variance between pleading and proof. The only question, therefore, is: What are the rights of the parties on the facts as found?

[2] As to the third and last installment, we note from the record that the complaint was filed on March 28th. Under the ninth finding, showing that shipments from Finland to New York took from 21 to 40 days, buyer's time to repent its anticipatory rejection of the last installment would not expire until April 9th, giving buyer the full limit of grace. . Seller's act of bringing suit before buyer's time of grace had expired converted the anticipatory rejection into an anticipatory breach, for which seller was entitled to recover.

Respecting the second installment, the tenth finding shows that seller in due time had shipped the proper quantity and quality of pulp from Finland. On February 18th seller informed buyer (seventh finding) that the shipment was then on the Atlantic. Expecting the vessel to arrive at Philadelphia on or before February 21st, seller in its message of the 18th informed buyer that it would hold the pulp for buyer until the close of business on the 21st, and asked to be advised if buyer wished to withdraw its cancellation and accept the merchandise. Buyer (eighth finding) made no response and thereby maintained its positive and unequivocal refusal (second and sixth findings) to do anything whatsoever in fullfillment of its equally positive and unequivocal obligations.

[3] In order to appraise the effect of buyer's aforesaid conduct upon seller's performance, then fully embarked upon and in process of fulfillment, it is proper to notice some of the terms of the contract in the light of the situation of the parties. Seller was in Finland. It had factories, but no ships. Seller engaged to manufacture in Finland certain quantities and qualities of pulp, and at certain times to deliver the pulp to ocean carriers for transportation to any port on the American Atlantic seaboard. Seller had no responsibility as to departure and arrival of vessels. Buyer was in Indiana. When seller's agent in New York

was informed by seller that a shipment was on the water and headed for a certain port, it was the agent's duty on behalf of seller to inform buyer in order that buyer might be at the dock to receive the pulp. Seller was obligated to see that the pulp was unloaded at the dock, and buyer was obligated to be there to receive it and arrange for its transportation to Indiana, either through its own agents or through seller's agent acting for buyer. Compare Kokomo Co. v. Republic of France (C. C. A.) 268 Fed. 917.

[4] Seller, in performance of its obligation, made proper pulp and shipped it in due time, notified buyer of expected time of arrival, and asked buyer to be present to receive the pulp. Now, because the arrival of the shipment was some days later than originally expected, and because seller did not again demand that buyer be present at the dock in Philadelphia to receive the pulp, buyer insists that it rightfully escapes on the ground of seller's nonperformance. With the goods at Philadelphia and buyer in Indiana, seller could not make an actual tender without going beyond its duty under the contract and thereby unnecessarily increasing the damages. Buyer had been notified to be present to receive this very shipment. Buyer's refusal to attend was a breach of duty on its part which prevented or excused (immaterial which view is taken) seller from further performance.

[5] Tender of goods on account of the first installment was less nearly perfect than on the second installment. Fourth, fifth, twelfth, thirteenth, and fourteenth findings. Concerning both the first and second installments, on which suit was begun after date for complete performance, the partial performances above set forth are only useful in emphasizing seller's willingness and ability to perform, and the decision actually turns on the question of law whether buyer's repudiation before seller started performance, and buyer's continuous repudiation after seller had embarked upon performance, prevented or excused seller from making strict and perfect tender on the due date.

What burden and risk of "election" should a promisor's anticipatory repudiation of his fair and binding promise cast upon the promisee? The promisor's proposal to cancel the promisee's obligations would, if accepted, be a good consideration for the promisee's release of the promisor's obligations. But it takes two to make the new bargain of mutual release. And if the promisor's proposal of cancellation is made when no benefit could possibly accrue to any one except himself, when by reason of his power in the business world to award future prizes or inflict future pains he expects or hopes to force the promisee to stand the loss, the only "election" which the law should permit to be cast upon the promisee is to say yes or no to the promisor's proposal of mutual releases. If the promisee says yes, the matter is at an end. If he says no[1] (meaning thereby that he declines to submit to the arbitrary and unjust demand), he should not be held to be digging pitfalls for himself and building isles of safety for the repudiator. And he is so betrayed, if the law makes more of his no than this:

"I refuse to accept your proposal of mutual releases. I am able and willing to go ahead with our arrangements as originally agreed upon, except

---

[1] The promisee's failure to say yes is one means of saying no.

that it may be necessary to count out the loss of time occasioned by your recalcitrance. This is the only 'election' or notice of my intention to which you are entitled. It is no concern of yours whether I sue you to-day on 'anticipatory breach' or on any other day down to the due date. If I do not sue you on 'anticipatory breach,' you may take my action in that regard as a continuing invitation to you to repent. Indeed, I may from time to time down to the due date repeatedly urge you to repentance, but only in the interest of your morality, not to increase your immorality by permitting you to claim immunity through my courtesy and fair dealing. I am giving you the opportunity to repent, and in that sense I am 'keeping the contract alive for your benefit,' but in no other sense. If despite your recalcitrance I do things looking toward performance, that is only to show my willingness and ability, for I realize that the law will not permit me to increase the damages by doing unnecessary things. And, finally, if by the due date you have not repented, I shall then and thereafter count on what had stood as your continuous anticipatory repudiation as having ripened into a completed breach."

We say that, in our judgment, the law should so pronounce, because the law should not be regarded as crystallized strata of a dead past, but as a living force that pulses in response to preponderant convictions of morality. Commercial law should reflect commercial morality. Over the portals of commerce no longer swings the ancient warning. Associations of commerce, leagues of advertisers, and of advertising publishers, courts of equity developing rules of fair trade, and the people through their representatives in Congress setting up a commission to promote and emphasize commercial morality in a broader sweep than is possible for courts, all these help to make plain the preponderant conviction of to-day. Repudiators of fair and solemn and binding promises are commercial sinners. If they are unrepentant, courts should hold them to the full consequences of their sins. While promisees should be encouraged to hold open the door to repentance, courts should be vigilant to see that repudiating promisors do not use that very door as an exit to immunity.

We say further that, in our judgment, the law has already so pronounced. It is quite impossible, within any reasonable limits, to analyze the authorities, to pick out the dicta, to compare case with case. In the margin[2] we set out the citations which the able and painstaking

[2] Seller cited: Allegheny Valley Brick Co. v. C. W. Raymond Co., 219 Fed. 477, 135 C. C. A. 189; Alpena Portland Cement Co. v. Backus, 156 Fed. 944, 84 C. C. A. 444; Anvil Mining Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814; Bernstein v. Meech, 130 N. Y. 354, 29 N. E. 255; Bigler v. Morgan, 77 N. Y. 312; Bradley v. Newsom, Sons & Co., [1919] A. C. 16, 53; Braithwaite v. Foreign Hardwood Co., [1905] 2 K. B. 543; Brown v. Muller, L. R. 7 Exch. 319; Canda v. Wick, 100 N. Y. 127, 2 N. E. 381; Bank of Columbia v. Hagner, 1 Pet. 455, 7 L. Ed. 219; 13 Corpus Juris, pp. 655, 656, note 82; Cort v. Ambergate Railway Co., 17 Q. B. 127; Cutter v. Powell, 2 Smith's Lead. Case, 1212; Daniels v. Newton, 114 Mass. 530, 19 Am. Rep. 384; Danube & Black Sea Railway v. Xenos, 11 C. B. (N. S.) 152; 13 C. B. (N. S.) 825; Donati v. Cleveland Grain Co., 221 Fed. 168, 137 C. C. A. 68; Duffy v. Patten, 74 Me. 396; Dunkirk Colliery Co. v. Lever, 41 L. T. 633; 43 L. T. 706; Ford v. Tilley, 6 B. & C. 325; Franchot v. Leach, 5 Cow. (N. Y.) 506; Frost v. Knight, L. R. 7 Exch. 111; Golden Cycle Mining Co. v. Rapson Coal Mining Co., 188 Fed. 179, 112 C. C. A. 95; Gorton v. Moeller Bros., 151 Iowa, 729, 130 N. W. 910; Habeler v. Rogers, 131 Fed. 43, 65 C. C. A. 281; Hickman v. Haynes, L. R. 10 C. P. 598; Hinckley v. Pittsburgh Steel Co., 121 U. S. 264, 7 Sup. Ct. 875, 30 L. Ed. 967; Hochster v De la Tour, 2 E. & B. 678;

counsel of these opposing parties have discussed at length. In our opinion the weight of authority is in line with what we regard as the sound reason of the matter.

The judgment is reversed, with the direction to enter judgment for plaintiff on the findings.

Honck v. Muller, 7 Q. B. D. 91; Johnstone v. Milling, 16 Q. B. D. 467; Kingman v. Western Mfg. Co., 92 Fed. 486, 34 C. C. A. 489; Krauter v. Simonin (C. C. A.) 274 Fed. 791; Lake Shore Ry. Co. v. Richards, 152 Ill. 59, 38 N. E. 773, 30 L. R. A. 33; Levey & Co. v. Goldberg, [1922] 1 K. B. 688; Louisville Packing Co. v. Crain, 141 Ky. 379, 132 S. W. 575; Mersey Steel & Iron Co. v. Naylor, Benzon & Co., 9 App. Cas. 434; Michael v. Hart & Co., [1902] 1 K. B. 482; Nickoll & Knight v. Ashton, Eldridge & Co., [1900] 2 Q. B. 298; Paducah Cooperage Co. v. Arkansas Stave Co., 193 Ky. 774, 237 S. W. 412; Pierson & Co. v. American Steel Export Co., 194 App. Div. 555, 185 N. Y. Supp. 527; Polson Logging Co. v. Neumeyer, 229 Fed. 705, 144 C. C. A. 115; Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693; Riendeau v. Bullock, 147 N. Y. 269, 41 N. E. 561; Ripley v. McClure, 4 Exch. 345; Robertson v. Garvan (D. C.) 270 Fed. 643; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Roller v. George H. Leonard & Co., 229 Fed. 607, 143 C. C. A. 629; Roper v. Johnston, L. R. & C. P. 167; 23 Ruling Case Law, p 1410; Sedgwick on Damages (9th Ed.) § 636d; Select Pictures Cor. v. Australasian Films, Ltd. (D. C.) 260 Fed. 296; Shaw v. Republic Life Insurance Co., 69 N. Y. 286; Shaw's Brow Iron Co. v. Birchgrove Steel Co., 6 T. L. R. 50; 7 T. L. R. 241; Skeele Coal Co. v. Arnold, 200 Fed. 393, 118 C. C. A. 545; Stanton v. Small, 3 Sandf. (N. Y.) 230; Traver v. Halsted, 23 Wend. (N. Y.) 66; Tredegar Iron & Coal Co. v. Hawthorne Brothers & Co., 18 T. L. R. 716; Tri-Bullion Smelting Co. v. Jacobsen, 233 Fed. 646, 147 C. C. A. 454; United Press Ass'n v. National Newspaper Ass'n, 237 Fed. 547, 150 C. C. A. 429; United States v. Illinois Surety Co., 226 Fed. 653, 141 C. C. A. 409; Illinois Surety Co. v. John Davis Co., 244 U. S. 376, 37 Sup. Ct. 614, 61 L. Ed. 1206; Vigers v. Sanderson, [1901] 1 K. B. 608; Wall Grocer Co. v. Jobbers' Overall Co. (C. C. A.) 264 Fed. 71; Wieler v. Schilizzi (1855) 17 C. B. 619; Williams v. Patrick, 177 Mass. 160, 58 N. E. 583; Williston on Contracts, §§ 683, 832, 1303.

Buyer cited: Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366; Roehm v. Horst. 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Hochster v. De la Tour, 2 E. & B. 678; Cleveland Mill Co. v. Rhodes, 121 U S. 255, 7 Sup. Ct. 882, 30 L. Ed. 920; Foss-Schneider Co. v. Bullock, 59 Fed. 83, 8 C. C. A. 14; Bowes v. Shand, L. R. 2 App. Cas. 455, 46 L. J. Q. B. 561; Elliott on Contracts, § 2048; Inman, Akers & Inman v. Elk, 116 Tenn. 141, 92 S. W. 760; Brown v. Norton, 50 Hun, 248, 2 N. Y. Supp. 869; Prescott v. Powles, 113 Wash. 177, 193 Pac. 680; 23 R. C. L. "Sales," § 244; Galle v. Hamburg, 233 Fed. 424, 147 C. C. A. 360; H. B. Williams Cooperage Co. v. Scofield, 115 Fed. 119, 53 C. C .A. 23; Ruling Case Law Sales, § 258; Williston on Sales, §§ 495, 457; McNairy v. Bishop, 8 Dana (Ky.) 150; Weltner v. Riggs, 3 W. Va. 445; Spooner v. Baxter, 16 Pick. (Mass.) 409; Rogers v. Van Hoesen, 12 Johns. (N. Y.) 220; Frost v. Knight, L. R. 7 Exch. 111; 6 R. C. L. "Contracts," § 385; Dambmann v. Lorentz, 70 Md. 380, 17 Atl. 389, 14 Am. St. Rep. 364; Krebs Hop Co. v. Livesley, 59 Or. 574, 114 Pac. 944, 118 Pac. 165, Ann. Cas. 1913C, 758; Greenwall, etc., Co. v. Markowitz, 97 Tex. 479, 79 S. W. 1069, 65 L. R. A. 302; Ernst v. Schmidt, 66 Wash. 452, 119 Pac. 828, Am. & Eng. Ann. Cases 1913C, 389; Rubber Trading Co. v. Manhattan, 221 N. Y. 120, 116 N. E. 789; Gentry v. Margolius, 110 Tenn. 669, 75 S. W. 959; Rayburn v. Comstock, 80 Mich. 448, 45 N. W. 378; Habeler v. Rogers, 131 Fed. 45, 65 C. C. A. 281; Eastern Oregon Land Co. v. Moody, 198 Fed. 7, 119 C. C. A. 135; Ziehen v. Smith, 148 N. Y. 558, 42 N. E. 1080; Williston on Contracts, § 832; Thick v. Detroit, etc., Co., 137 Mich. 708, 101 N. W. 64, 109 Am. St. Rep. 694; Pierson v. Crooks, 115 N. Y. 539, 22 N. E. 349, 12 Am. St. Rep. 831; Whitney v. McLean, 4 App. Div. 449, 38 N. Y. Supp. 793; Daniel on Negotiable Instruments (3d Ed.) 1734b, 1734c.